IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 3:23 CR 56 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | |
| | ) | |
| LEE FRIEDMAN, | ) | MOTION |
| | ) | |
| Defendant. | ) | |

## MOTION TO REVOKE BOND

While on pretrial release, Defendant Lee Friedman has committed new federal money laundering offenses and failed to notify pretrial services of his law enforcement contacts related to those offenses.  The Court should accordingly revoke Mr. Friedman's bond under 18 U.S.C. § 3148 and detain him pending trial in January.

When he was arrested in April 2023, Mr. Friedman was released on typical conditions: he was not to violate federal law and must report all law enforcement contacts.  Amended Order Setting Conditions of Release, Doc. 11.  He later asked for permission to travel extensively in January 2024, Motion to Amend Conditions, Doc. 33, proclaiming himself the "proprietor of a global transaction management company" and describing its activities in the vaguest terms imaginable, *id.*, Doc. 33-1.  The Court granted the request.  Unfortunately, the Court's trust in Mr. Friedman would go unrewarded.

Late last year and earlier this year, the Medicaid programs for North Carolina and Utah were victimized by e-mail compromise or social engineering fraud.  In short, their employees

were tricked into using wiring information that directed Medicaid funds meant for hospitals into accounts controlled by others.  North Carolina lost $600,000, and Utah lost $1.4 million.

In both instances, the stolen money was sent to Mr. Friedman's business account at JP Morgan Chase.  Mr. Friedman dutifully sent the money (after keeping his share) to a Mexican lawyer operating as a "legal consultant" in Florida, who apparently converted the money to cryptocurrency and sent it to an Ethereum wallet.  The money's current whereabouts are unknown and probably will never be learned.

Getting his excuses on the record ahead of any investigation, Mr. Friedman on March 28, 2025 filed an FBI complaint, his first unreported law enforcement contact.  Appendix: Friedman Complaint.  In the complaint, Mr. Friedman explains, in the vaguest terms imaginable, that "William Han of Waitech Group" contacted him in June 2024 for "assistance with upcoming transactions."  *Id.*  In November, Mr. Friedman was then "introduced to Richard Lee Zhao via WhatsApp and instructed to work with him directly."  *Id.*  Mr. Friedman provided contact info for his "Waitech Group" clients, including their website, waitechag.com, and an address, 56 Conduit Road, Mid-Levels West, Hong Kong.

Mr. Friedman continued his complaint with a perfectly substance-free description of events: The "first transaction occurred weeks later, during which we managed the process per our consulting agreement, receiving confirmation from both parties that the transaction was completed."  *Id.*  Concerning the Utah theft, Mr. Friedman claimed "Richard notified us of another transaction requiring our assistance," but "despite instructions to send funds to the new accounts, the funds were deposited into our business account," after which "[w]e engaged our JV partner, Reygadas & Associates, to facilitate the transaction, ensuring compliance with the

disbursement agreements." *Id.*  Chase contacted Mr. Friedman about the problem on March 28, 2025, which he assured the FBI was his "first awareness of any problem." *Id.*

The Government subsequently gathered basic information that was readily available to Mr. Friedman and pieced together the following chronology.  The information comes from Mr. Friedman's FBI complaint, the FBI's interview of Mr. Friedman, and other records, all of which will be provided to Mr. Friedman's counsel and presented at any revocation hearing.

*Contact with Hong Kong Individuals*:  In June 2024, Mr. Friedman was contacted by "William Han" of Waitech Group and later introduced to "Richard Lee Zhao" from the same company via WhatsApp.  Their business website was waitechag.com.  Simply navigating to the "About Us" section of that webpage tells the reader that Waitech's expertise lies "in designing and producing cutting-edge wireless consumer goods."  On the "Contact" page, Waitech lists 1/F No. 20 Ngan Fung St., Wong Tai Sin, Kowloon, Hong Kong as its corporate headquarters.

Mr. Friedman's Waitech "contacts," however, had a different address, 56 Conduit Road, Mid-Levels West, Hong Kong.  That address is not a Waitech building but instead "Blessings Garden Phase 2," a high-rise apartment complex.  One can easily learn this by googling the address.  From the beginning, Mr. Friedman had every reason to be skeptical of who he was dealing with.[1]

---

[1] Googling "waitech ag" and selecting "News" from the search results provides a news article from BlockTribune dated November 20, 2024 about a lawsuit over lost funds that "were distributed based on instructions from someone misrepresenting themselves as a representative of a Hong Kong company, Waitech AG Group."  Lawsuit Claims Funds from Construction Company Sale Were Used for Crypto Purchases, BlockTribune, Nov. 20, 2024, *available at*: https://blocktribune.com/lawsuit-claims-funds-from-construction-company-sale-were-used-for-crypto-purchases/.

*North Carolina Medicaid Funds.*  On August 8, 2022, Mr. Friedman as sole signer opened Chase account x7136 in the name of ITS Investing, LLC.  On November 20, 2024, the account had a balance of one penny.  That day, Chase x7136 received an incoming wire transfer of $396,861.09.  Seven days later, the account received transfers of $182,696.99 and $39,135.48 for a total of $618,693.56.  The bank statement—not Chase's back office financial systems, but the consumer's bank statement—read as follows:

### DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | | AMOUNT |
|------|-------------|---|---|--------|
| 11/20 | Orig CO Name:Csra Dhb Payment | Orig ID: ▮▮ | Desc Date: CO Entry | $396,861.09 |
| | Descr:Payments  Sec:CCD   Trace#: | ▮▮ Eed: ▮ Ind ID: | | |
| | Ind Name:The Moses H Cone Memor | Trn* ▮ | ▮NC Tracks | |
| | Activity For 835\ Tm: ▮ | Tc | | |
| 11/27 | Orig CO Name:Csra Dhb Payment | Orig ID: ▮ | Desc Date: CO Entry | 182,696.99 |
| | Descr:Payments  Sec:CCD   Trace#: | ▮ Eed: ▮ Ind ID: | | |
| | Ind Name:Alamance Regional Medi | Trn* ▮ | ▮NC Tracks | |
| | Activity For 835\ Tm: ▮ | Tc | | |
| 11/27 | Orig CO Name:Csra Dhb Payment | Orig ID: ▮ | Desc Date: CO Entry | 39,135.48 |
| | Descr:Payments  Sec:CCD   Trace#: | ▮ Eed: ▮ Ind ID: | | |
| | Ind Name:The Moses H Cone Memor | Trn* ▮ | ▮NC Tracks | |
| | Activity For 835\ Tm: ▮ | Tc | | |
| **Total Deposits and Additions** | | | | **$618,693.56** |

If one simply googles "Csra Dhb Payment," the results do not suggest a payment from Waitech AG, or anyone else associated with wireless consumer goods.  The first result instead is a webpage for North Carolina Medicaid.  Doing the same for "The Moses H Cone Memor," which appears under the "Ind Name" heading lists the Moses Cone Hospital in Greensboro, North Carolina as a top result.  Searching for "Alamance Regional Medi" gives a result of Alamance Regional Medical Center in Burlington, NC.  Finally, googling "NC Tracks" takes one to a North Carolina government webpage called "NCTracks," described as "the multi-payer Medicaid Management Information System for the N.C. Department of Health and Human Services."[2]

---

[2] North Carolina's Medicaid authority made an FBI complaint on March 20, 2025, reporting constant fraudulent attacks on its payment system.  The state claimed to repel most attacks, but at

Mr. Friedman had about ten days between the time he first received the money until he parted with it to contemplate this question: "What on Earth is Richard Lee Zhao, supposedly representing wireless consumer product company Waitech AG from a high-rise residential building in Hong Kong, doing with $600,000 of North Carolina's Medicaid money meant for identified North Carolina hospitals?"  The question answers itself, but apparently eluded Mr. Friedman.  His response was to take his cut, $18,561.00, and send the money to Jose A. Reygadas of Reygadas & Associates in Miami, Florida.

Mr. Reygadas describes his work as "legal & business affairs consultant[ing]."  Reygadas & Associates, *available at* www.reygadas.com.  It is not a law firm because Mr. Reygadas does not appear to be a lawyer licensed to practice law in the United States.  Florida lists him as a "foreign legal consultant," with the note "Limited Practice Of Law in Florida."  His webpage bio lists offices in Miami and Mexico City, indicates he is a member of the Mexican bar, but does not claim any U.S. bar admissions.  About, Reygadas & Associates, *available at* https://www.reygadas.com/jose-reygadas.  Mr. Friedman transferred the money from his Chase x7136 account to a Chase account controlled by Mr. Raygadas with a branch address in Lima, Ohio.

*Utah's Medicaid Funds.*  The pattern repeated itself a few months later with $1.4 million stolen from Utah's Medicaid program.  With his Chase x7136 account at a $100 balance, Mr. Friedman received the following deposits in February 2025:

---

least one succeeded.  The state identified Mr. Friedman's Chase x7136 as the recipient of fraudulently-obtained funds on that occasion.

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | | AMOUNT |
|------|-------------|--|--|--------|
| 02/19 | Orig CO Name:UT Medicaid<br>Descr:Pts Trans Sec:CCD Trace#: | Orig ID: <br> Eed: | Desc Date:250217 CO Entry<br>Ind | $677,778.13 |
| | *Pts016 *Intermountain Health Mck Kay-Dee Trn: | Ind Name:Intermountain Health M Nte | Tc | |
| 02/19 | Orig CO Name:UT Medicaid<br>Descr:Pts Trans Sec:CCD Trace#: <br> ID: | Orig ID: <br> Eed: P Ind<br>Ind Name:Intermountain Health S Nte | Desc Date:250217 CO Entry | 586,484.80 |
| | *Pts016 *Intermountain Health St George Tm: | | Tc | |
| 02/19 | Orig CO Name:UT Medicaid<br>Descr:Pts Trans Sec:CCD Trace#: <br> ID: | Orig ID: <br> Eed: Ind<br>Ind Name:Intermountain Health L Nte | Desc Date:250217 CO Entry | 174,849.20 |
| | *Pts016 *Intermountain Health Log Gan Reg Trn: | | Tc | |
| **Total Deposits and Additions** | | | | **$1,439,112.13** |

Unlike the North Carolina theft, the bank statement information here leaves little to Google or the imagination.  "UT Medicaid," speaks for itself and "Intermountain Health Mck Kay-Dee," "Intermountain Health St George," and "Intermountain Health Log Gan Reg," are all quickly identifiable as medical centers belonging to the Intermountain Health system in Utah. On February 21, 2025, Mr. Friedman sent the money to Mr. Reygadas (again) after taking his cut (again), this time for $21,687.00.  In the end, Mr. Friedman's ITS Investing account had thirty-six cents left after all of the transfers.

Three months after first receiving stolen Medicaid money, Mr. Friedman was again confronted with this question "What on Earth is Richard Lee Zhao, supposedly representing wireless consumer product company Waitech AG from a high-rise residential building in Hong Kong, doing with $1.4 million of Utah's Medicaid money meant for identified Utah hospitals?" Perhaps knowing the answer would come at the cost of his $21,000 fee and a possible reputation as a compliant money-launderer, Mr. Friedman ignored the obvious.

The FBI in Utah, however, did not ignore the obvious and interviewed Mr. Friedman by phone on May 5, 2025, his second unreported law enforcement contact.  As the Utah FBI found out, Mr. Friedman is a cornucopia of excuses when it comes to his behavior, but he did helpfully admit that he knew he was supposedly conducting a financial transaction involving an overseas

party and the Moses H. Cone Memorial Hospital, which was supposed to be one of the recipients of North Carolina's Medicaid money. He claimed to be clueless about Utah's Medicaid money.

Mr. Friedman was ordered not to commit another federal offense, and his transfers of stolen Medicaid money to Reygadas, all vastly exceeding $10,000, are federal money-laundering offenses in violation of 18 U.S.C. § 1957. The only question worth considering is whether Mr. Friedman knew the money represented proceeds of unlawful activity. That can be proven by circumstantial evidence, and willful blindness counts for proving knowledge. With these concepts in mind, it's not hard to conclude that Mr. Friedman committed these federal money-laundering offenses.

But that conclusion proves too much concerning bond revocation, because 18 U.S.C. § 3148(b) says that a "judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer finds that there is *probable cause* to believe that the person has committed a Federal, State, or local crime while on release," and "finds that the person is unlikely to abide by any condition or combination of conditions of release." (emphasis added). Probable cause—the same standard used by a grand jury to return an indictment and by a court to issue a search warrant—is easily satisfied with the facts described above.

What about the likelihood Mr. Friedman will, given another chance, abide by the Court's conditions of release? The only assurance the Court is likely to get is Mr. Friedman's word, so the Court will have to decide what that is worth. But it should also consider other factors, such as Mr. Friedman's failure to report his contacts with law enforcement. And in making its decision, the Court should demand answers about Mr. Friedman's business affairs that go beyond lofty aspirations of being the "proprietor of a global transaction management company"

who assists clients with "transactions" and "inspections" "around the world."  Motion to Amend Conditions, Doc. 33-1.  Answers, not obfuscation, should be the goal at any revocation hearing.

Mr. Friedman's first set of answers should address the following discovery.  When the Government first learned Mr. Friedman was laundering money stolen from state Medicaid programs, it obtained Chase bank records for Mr. Friedman covering August 2024 through March 2025.  Mr. Friedman has 29 Chase accounts—*twenty-nine*.  As of March 31, 2025, the vast majority of them had no balance—like the Chase x7136 account used to launder the Medicaid money—as if they were simply waiting on the shelf until needed.  Whatever one takes from the Chase records, it hardly inspires confidence in Mr. Friedman's vision of himself as a legitimate, successful businessman.  Again, if Mr. Friedman wants to remain on bond, he needs to provide answers (real ones) so the Court can reliably determine the likelihood he will comply with appropriate conditions.

The Government proposes that the Court hold a hearing and revoke Mr. Friedman's bond on the standard described in 18 U.S.C § 3148.  It should then give him a week or so to provide a list of all financial accounts of any kind located at any bank in any country for which he has any interest.  Following that, the Court should give Mr. Friedman a week or so to close them all and then permit him to maintain a single account, in his personal name, for his personal affairs.  Mr. Friedman opened the accounts.  They have no balances and thus no apparent legitimate purpose.  He can find a way to close them quickly.

Defendants released on bond are given an opportunity to maintain a significant degree of freedom despite being under indictment.  Some choose to prepare a defense, some choose to continue supporting a family, and some choose to commit new money-laundering offenses.  Mr. Friedman had his chance.  He doesn't deserve another.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:   /s/ Gene Crawford
      Gene Crawford (OH: 0076280)
      Assistant United States Attorney
      Four Seagate, Suite 308
      Toledo, OH 43604
      (419) 241-0726
      (419) 259-6360 (facsimile)
      Gene.Crawford@usdoj.gov

Appendix: Friedman Complaint

**Describe what happened in your own words. Provide any information you have yet to include in this complaint that may assist law enforcement in understanding what happened.:**

In June 2024, my company received an email from William Han of Waitech Group through our website. We followed up, and I later sent a follow-up email regarding the client's need for assistance with upcoming transactions. After several exchanges, we provided our onboarding documents, which were returned after a few months. The client then informed us they were still working on finalizing the transactions we were to manage.

Months later, in November, we were introduced to Richard Leezhao [sic] via WhatsApp and instructed to work with him directly. The first transaction occurred weeks later, during which we managed the process per our consulting agreement, receiving confirmation from both parties that the transaction was completed. Subsequently, we established a JV agreement with Jose Reygadas & Associates to assist with this and future clients, directing all EPS client transaction funds to Jose.

In February 2025, Richard notified us of another transaction requiring our assistance. On February19, 2025, despite instructions to send funds to the new accounts, the funds were deposited into our business account. We engaged our JV partner, Reygadas & Associates, to facilitate the transaction, ensuring compliance with the disbursement agreements. After receiving confirmation from both parties, the funds were transferred to Reygadas & Associates, who handled the final disbursements per client instructions.

On March 28, 2025, Chase notified me of an issue with the deposited funds—our first awareness of any problem. Following instructions from Reygadas & Associates, I am filing this complaint to assist as needed and am prepared to provide all relevant documentation.